UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV205 HEA |
| | ) | |
| U.S. BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment, [Doc. No. 30]. Plaintiff opposes the motion. For the reasons set forth below, the Motion is granted.

Plaintiff brought this action seeking to recover a commission on certain cash deposits made at his former employer Defendant's institution.

## Facts and Background

Plaintiff's Petition[1] alleges claims for breach of contract, (Count I); promissory estoppel, (Counts II); fraudulent omission, (Count III); and negligent

---

[1] This matter was originally brought in the Circuit Court for the City of St. Louis and was removed to this Court on the basis of diversity of citizenship, hence the designation of "Petition" as Plaintiff's initial pleading.

omissions, (Count IV).[2]  The Petition alleges the following: that Plaintiff and

Defendant entered into a contract whereby Defendant agreed to pay him

commissions on certain sales.  The contract was reduced to writing for the calendar

year 2003.  Plaintiff attached a copy of the summary of the sales plan for the year

2003 to his Petition.  Pursuant to the commission sales plan, Plaintiff was eligible

for commission awards for new sales of IT&C products or services made in 2003

based on production levels with the commissions paid out at 20-40% based on the

production level.  Commissions were to be calculated based on estimated first year

revenue and commissions are to be paid when the account is funded.  Pursuant to

the terms of the plan in 2003, new sales upon which commissions were based were

defined as sales of an IT&C product or service to a new customer secured through

an ascertainable sales effort.  New sales were defined to be new recurring fee

business or additions to existing recurring fee accounts provided the additions were

specifically solicited and would not have occurred otherwise.  Plaintiff further

alleges that his securing the Scottrade and Lehman Brothers accounts met the

requirements for new sales of IT&C products and services in the 2003 sales plan.

Plaintiff requested to be paid commissions on the Lehman Brothers and Scottrade

---

[2]  The Petition originally contained Count V, which was a promissory estoppel claim
against Ann Vasques.  On February 13, 2007, the Court dismissed Defendant as fraudulently
joined.

accounts. Defendant refused to pay commissions based on the contention that the business obtained by Plaintiff did not produce incidental revenue for the bank. Plaintiff claims the denial of the commissions was a breach of the sales plan and a breach of Defendant's promise to pay. Further, Plaintiff claims Defendant knew it would not pay commissions when Plaintiff was soliciting the sales but did not inform Plaintiff that the commissions would not be paid. Plaintiff also claims that Defendant failed to exercise reasonable care in failing to inform him that it did not intend to pay commissions on these two accounts, and that the plan document was provided to a limited group of people including Plaintiff. Count V of Plaintiff's Petition, styled "Promissory Estoppel" claims Defendant's denial of Plaintiff's commission constituted a tort.

Plaintiff began working for Defendant in 2000 as a sales person in the Institutional Trust & Custody department, (IT&C). He was hired by, and reported to, Larry Woodcock. Plaintiff worked out of the St. Louis office, while Woodcock worked out of Cincinnati.

The IT&C department provides services to institutional customers. Institutional customers include registered investment advisors, insurance companies and government agencies. IT&C would safekeep assets for institutional customers in custody accounts, settle their trades when they bought and sold securities, collect

income, and process corporate actions. These services were provided in exchange for fees paid by the institutional customer.

Plaintiff testified that he would typically meet with a prospect who needed a custody account to keep assets and would submit a proposal to that customer. If the prospect accepted, Plaintiff would send them the account paperwork and the written custody agreement. After the account was set up and the securities were deposited in the Bank, Plaintiff had no more responsibility for servicing the custody account.

Plaintiff testified that Defendant would collect fees for custody accounts by sending out invoices to clients for the fees they owed to Defendant. Almost all of the accounts Plaintiff set up during his time at Defendant were traditional custody accounts.

Plaintiff received a salary and was paid commissions under a commission plan. As Plaintiff testified, he received commissions based on expected revenue to Defendant. In 2003, Plaintiff's commissions were paid pursuant to the "Institutional Trust and Custody 2003 Business Development Officer Sales Plan" (the Plan). Plaintiff was provided with a Plan Summary. The Purpose of the Plan was to reward employees for generating additional fee income.

The Plan Summary provides that commissions are calculated based on estimated first year revenues. In the event the new business terminates within 12

months from the date booked, the original commission paid is deducted from the employee's next commission payment. Plaintiff understood that under the terms of the Plan, if an account is closed within 12 months, Defendant has a right to get back any commission paid on it.

The Plan Summary also states that "Management may adjust payments at its own discretion to reflect the impact of any event that distorts actual results achieved. All rewards are paid at the discretion of management. The Head of IT&C, Diane Thormodsgard, was vested with the general authority and on going responsibility for administration of the Plan. Plaintiff testified that during the first five year period of employment with Defendant, he never knew that there was an oversight committee that met to determine commission payments.

The Plan Summary provides that "In the event of any disagreement between the plan summary and the formal plan document, the plan document will govern."[3]

---

[3] Plaintiff "denies" this allegation, but fails to cite a specific reference to the record on which he relies for this denial. Local Rule 4.01(E) provides with respect to summary judgment motions:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine dispute exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant

The Plan explicitly states that the Head of IT&C has authority to interpret the terms of the Plan.

In 2003, Defendant's Broker-Dealer department became aware that other banks were offering brokerage clients a trust product in which to keep cash to satisfy the brokerage client's obligations under Section 15c3-3(e) of the Rules of the Securities and Exchange Commission, 17 C.F.R. § 15c3-3(e). Plaintiff testified that he was approached by Woody Johnson, an employee of Defendant in the Broker-Dealer department in March 2003 regarding an opportunity to set up a custody account for a broker-dealer. Two brokerage houses, Lehman Brothers and Scottrade, established accounts which are the subject of this matter. These accounts

---

shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.
E.D. Mo. L.R. 4.01(E).

Plaintiff responded to Defendant' statements of uncontroverted material facts by filing a document containing numbered paragraphs in which Plaintiff admitted or denied each statement of material fact, often providing affirmative statements in support of the denials. Plaintiff did not, however, include in his response "specific references to portions of the record, where available, upon which the opposing party relies." E.D. Mo. L.R. 4.01(E). As a result, Plaintiff is deemed to have admitted Defendants' statements of material fact except to the extent that his denial is supported by specific references to the record. *Huckins v. Hollingsworth*, 138 Fed.Appx. 860, 862 (8th Cir.2005)(where plaintiffs responded to the defendants' statements of material facts by paragraph number as required by local rule but did not fully comply with that rule by submitting their own concise statement of material facts as to which they contended there exists a genuine issue to be tried, and instead provided the district court with affidavits, the district court did not abuse its discretion when it recounted the defendants' statements of facts verbatim but noted whenever the plaintiffs properly disputed a fact and the ground for their dispute).

were governed by agreements between Defendant and the named brokerage houses entitled "Special Reserve Bank Account Agreement." These Agreements were generated by outside counsel. Although Plaintiff played no role in drafting these documents, he did see them. He had no role in getting the agreements signed. Plaintiff had no contact with anyone at Scottrade or Lehman Brothers.

The money Scottrade deposited in the Special Reserve Bank Account was already held by Defendant in the form of treasury bills. Defendant was generating fee income by purchasing treasury bills on behalf of Scottrade.

In exchange for the cash deposited by Scottrade and Lehman Brothers, Defeat paid these brokerage houses interest. Defendant paid Lehman Brothers interest at the rate of the federal fund rate plus ten basis points. Defendant paid Scottrade interest at the rate of federal funds minus five basis points.

These accounts were different from traditional trust accounts in that Defendant paid Scottrade and Lehman Brothers interest and neither Scottrade nor Lehman Brothers received a bill from Defendant for keeping the account or paid Defendant a fee for holding the account. Plaintiff testified that "the fee was the revenues generated by the Bank by the deposits being held by the bank."

Under the terms of both account agreements, the money deposited was required to remain uninvested cash.

Plaintiff testified that Daryl Bible, the then Head of Defendant's Treasury Department would be the person that would have the best knowledge regarding the benefits, if any to Defendant resulting from these Special Reserve Bank Accounts.

On June 16, 2003, Larry Woodcock sent an email to the IT&C department explaining that deposits made in Broker Dealer Special Reserve Accounts could not be invested in overnight money market accounts and instructed the sales staff to stop promoting accounts to broker dealers.

Lehman Brothers terminated its Special Reserve bank Account within 12 months of the time it was booked in June, 2003.

Under the terms of these Agreements, neither Lehman Brothers nor Scottrade paid any fees or revenues to Defendant for any custodial or banking services attributable to these deposits.  Neither of these accounts produced fees or actual revenues to Defendant from the performance of banking services for Lehman Brothers or Scottrade during the 12 months following the deposits.  Defendant, however, paid Lehman Brothers and Scottrade interest on these deposits.

Fund transfer pricing is an internal bookkeeping metric used by Defendant to assign internal credit for transactions to various business units of Defendant.  It does not reflect actual fee income or revenue received by Defendant for banking services. Since the Scottrade and Lehman Brothers Special Reserve deposits did provide

Defendant with liquidity, Bible decided to give the IT&C and Broker-Dealer departments credit for internal bookkeeping purposes, for securing these deposits. The internal credit Bible assigned, or fund transfer pricing, changed over time according to Defendant's marginal cost of borrowing. At times, the fund transfer pricing was lower than the interest rate Defendant paid to Lehman Brothers or Scottrade. In those instances, the difference between the fund transfer pricing and the interest rate paid reflected Defendant's additional interest costs on those deposits and did not reflect actual revenue or fee income received by Defendant for banking services. Bible explained to Ann Vasquez, a bank officer in Defendant's broker-dealer department and who was responsible for these two accounts, that Defendant was losing money on these broker deposits.

Plaintiff testified that his boss, Woodcock believed commissions would be paid on these accounts. On June 18, 2003, Plaintiff submitted an Institutional Trust & Custody Sales Report Form seeking a commission on the Lehman Brothers Account. Plaintiff claimed the Lehman Brothers account would generate $3,600,000 in actual fees. According to Plaintiff, he was seeking a commission based on the difference between what Defendant could earn by investing the Lehman Brothers deposit and the interest it had to pay to Lehman Brothers. Plaintiff could not identify any individual who was paid a commission based on fund transfer

pricings credited to the trust department by Defendant's Treasury Department, as opposed to commissions based on actual fee income.

On August 6, 2003, Plaintiff submitted an IT&C Sales Report Form seeking a commission on the Scottrade Account. Plaintiff claimed the Scottrade account would generate $3,289,863 in fees.

Thormodsgard discussed with Bible whether commissions should be paid on the Scottrade and Lehman Brothers Special Reserve Bank Accounts. Bible confirmed to Thormodsgard that the accounts would not produce incremental revenue for Defendant.

At the time he submitted his Sales Report, Plaintiff knew that bank management did not all agree that the Lehman deposit was a commissionable sale. He understood that he would not receive a commission on new business unless the bank earned revenue on the business. Plaintiff also understood that Defendant did not provide any banking services to Lehman Brothers and Scottrade for these Special Reserve Bank Accounts, other than holding the cash deposited.

Plaintiff testified he never had any conversations with Thormodsgard about whether he would get a commission on the Lehman Brothers or Scottrade Accounts. Further, prior to the time the deposits were made, Plaintiff did not have any conversations with Thormodsgard or Marsha Croxton, who at the time worked in

the IT&C department and was responsible for managing the Institutional Custody side of the Department. Plaintiff does not recall having a conversation with Woodcock. No one ever specifically told Plaintiff he would receive a commission on these two accounts.

On December 12, 2003, Chris Blair, Sales Manager for IT&C, confirmed to Plaintiff that he had spoken with Thormodsgard regarding the commissions on these two accounts, and that Defendant had denied the commission request because the accounts did not generate incremental revenue for the bank and the credits shown on IT&C's books from the accounts was for accounting purposes only.

Plaintiff could not identify any employee of Defendant who failed to tell him something they should have know with regard to commissions on the broker-dealer deposit accounts.

## Standard of Review

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005); *Littrell v. City of Kansas City, Mo.,* 459 F.3d 918, 921 (8th Cir. 2006). The moving party has

the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Littrell*, 459 F.3d at 921. "The party opposing summary judgment may not rest on the allegations in its pleadings; it must 'set forth specific facts showing that there is a genuine issue for trial.'" *United of Omaha Life Ins. Co. v. Honea,* 458 F.3d 788, 791 (8th Cir.2006) (quoting Fed.R.Civ.P. 56(e)); "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)." *Hitt v. Harsco Corp.,* 356 F.3d 920, 923 (8th Cir. 2004). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson,* 477 U.S. at 248; *Woods,* 409 F.3d at 990. To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere

speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d

237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health System*, 348

F.3d 732, 733-34 (8th Cir. 2003). A plaintiff may not merely point to unsupported

self-serving allegations, but must substantiate allegations with sufficient probative

evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus.*

*Mach. Corp.,* 62 F.3d 237, 241 (8th Cir.1995). "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477

U.S. 242 at 252; *Davidson & Associates v. Jung* 422 F.3d 630, 638 (8th Cir. 2005).

Summary Judgment will be granted when, viewing the evidence in the light most

favorable to the nonmoving party and giving the nonmoving party the benefit of all

reasonable inferences, there are no genuine issues of material fact and the moving

party is entitled to judgment as a matter of law. *Samuels v. Kansas City Mo. Sch.*

*Dist.,* 437 F.3d 797, 801 (8th Cir. 2006). "Mere allegations, unsupported by

specific facts or evidence beyond the nonmoving party's own conclusions, are

insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483

F.3d 516, 526-7(8th Cir. 2007). "Simply referencing the complaint, or alleging that

a fact is otherwise, is insufficient to show there is a genuine issue for trial."

*Kountze ex rel. Hitchcock Foundation v. Gaines* 2008 WL 2609197, 3 (8th Cir.

2008).

**<u>Discussion</u>**

As a threshold matter, Plaintiff concedes that the Lehman Brothers Account was closed within 12 months, and thus any commission to which he would have been entitled would necessarily be required under the plan to be returned to Defendant. Summary Judgment is therefore appropriate with respect to the claims regarding the Lehman Brothers Account without further discussion.

**Breach of Contract Claim**

To state a cause of action for breach of contract, Plaintiff must plead: (1) mutual agreement between parties; (2) mutual obligations arising out of the agreement; (3) valid consideration; (4) part performance by one party; and (5) damages resulting from the breach of the contract. *Brickey v. Concerned Care of Midwest, Inc.,* 988 S.W.2d 592, 594 (Mo.App. E.D.,1999).

The fundamental, and irreconcilable, flaw in Plaintiff's breach of contract claim is his inability to establish genuine issues of any material fact as to the commissionability of the Scottrade Account. While Plaintiff argues that there was discussion of a commission and a belief by Plaintiff and his immediate boss that Plaintiff was entitled to a commission, these beliefs and understandings fail to overcome the clear language of the plan itself: "New sales must meet the following

business criteria:

> New recurring-fee business, provided applicable market standards and minimum fees apply.

> Additions to existing recurring-fee accounts, provided said additions were approved by management and specifically solicited by the B[usiness] D[evelopment] O[fficer], and would not have occurred otherwise. (Sales to existing client relationships require specific Management pre-approval).

Also included within the plan and the plan summary is the definition of "Actual Revenue:"

> Actual Revenue will have the following meaning:

>> Proprietary funds is defined as the estimated "Net Advisory Fee earned by the bank.

>> Non-proprietary mutual or other NAV funds will be

>> defined as actual revenue received.

>> Securities Lending revenue is defined as the net actual revenue earned by the bank.

>> Liquidity Management Product revenue is defined as 50% of the actual revenue earned by the bank.

>> All other products will be defined as actual revenue received.

Plaintiff agrees, in his deposition, that it was his understanding that in order for a commissionable event to happen, there had to be actual revenues to the bank,

and in the absence of actual revenues, no commission was awarded. Indeed, the plan clearly sets forth this notion in its purpose statement, "The purpose of the 2003 Business Development Officer (BDO) Sales Plan is to reward employees participating in the Plan for generating *additional fee income* through new IT&C business." (emphasis added).

Plaintiff has produced no evidence to controvert Defendant's evidence that no fee income or actual revenue was generated through this account. The internal bookkeeping entries reflecting credits does not transform the account into one which produces fee income or actual revenue. Because the primary condition precedent to obtaining a commission had not been met, *i.e.,* "a new sale" as defined by the plan, Plaintiff was not entitled to a commission on the Scottrade account. There was, therefore no breach of the plan.

**Promissory Estoppel Claim**

A claim of promissory estoppel has four elements: (1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure. *Zipper v. Health Midwest,* 978 S.W.2d 398, 411 (Mo.App.1998); *see In re Jamison's Estate,* 202 S.W.2d 879, 886 (Mo.1947). The promise giving rise to the cause of action must be definite, and the promise must be made in a contractual sense. *Zipper* at 411. In Missouri, promissory estoppel is not a favorite of the law, and each element must clearly appear and be proven by the party seeking its enforcement. *Id.*

*Clevenger v. Oliver Ins. Agency, Inc.* 237 S.W.3d 588, 590 (Mo.,2007)

Promissory estoppel, however, is not available "'when an unambiguous contract exists that covers the issue for which damages are sought. Promissory estoppel cannot be used to create rights not included within the contract.' *Halls Ferry Investments, Inc. v. Smith,* 985 S.W.2d 848, 853 (Mo.App. E.D.1998)." *Roth v. Equitable Life Assur. Soc. of U.S.*, 210 S.W.3d 253, 262 (Mo.App. E.D.,2006).

The Sales Plan creates the right which Plaintiff claims he was denied, *i.e.*, the commission. The Plan details the requirements a sale must satisfy in order to be commissionable. The plan upon which Plaintiff relies for his alleged commission exists. Plaintiff is precluded from attempting to recover the commission under a promissory estoppel theory, *ergo*, Plaintiff's promissory estoppel claim must fail.

**Fraudulent Omission Claim**

Plaintiff claims that Defendant knew it would not pay him commission on the Scottrade account and that this failure to disclose was fraudulent.

To make a submissible case of fraudulent misrepresentation, a plaintiff is required to prove nine essential elements:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent

that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.

*Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007). Missouri courts have not recognized a separate tort of fraudulent nondisclosure. *Id.* "Instead, in such cases, a party's silence in the face of a legal duty to speak replaces the first element: the existence of a representation." *Id.*

"'Whether or not a duty to disclose exists ... must be determined on the facts of the particular case.'" *Id.* (quoting *Ringstreet Northcrest, Inc. v. Bisanz*, 890 S.W.2d 713, 720 (Mo.App. W.D. 1995)). "A duty to speak arises where one party has superior knowledge or information that is not reasonably available to the other." *Id.* "'Silence can be an act of fraud where matters are not what they appear to be and the true state of affairs is not discoverable by ordinary diligence.'" *Id.* (quoting *Bayne v. Jenkins*, 593 S.W.2d 519, 529 (Mo. banc 1980)).

"Even with superior knowledge, a duty to disclose will be imposed only if the material facts would not be discovered through the exercise of ordinary diligence." *Id.* at 766.

"The concept of fraud liability based upon nondisclosure couches reliance in

terms of the availability of the information to the plaintiff and the plaintiff's diligence." *Keefhaver v. Kimbrell*, 58 S.W.3d 54, 60 (Mo.App. W.D.2001). "A plaintiff asserting fraud must show that the undisclosed information was beyond her reasonable reach and not discoverable in the exercise of reasonable diligence." *Id.*

A person is entitled to rely on a representation where "(1)[he] lacks equal facilities for learning the truth; (2) where the facts are peculiarly within the knowledge of the speaker and difficult for the hearer to ascertain; (3) where the representation relates to latent defects; (4) where it would be necessary to employ a third person to make an examination in order to discover the truth because of the hearer's ignorance and inexperience; and (5) where the employment of an expert would be required. *Id.*" *Richards v. ABN Amro Mortg. Group, Inc.* 2008 WL 2414960, 3-4 (Mo.App. W.D. June 17, 2008).

Plaintiff's fraudulent omission claim fails because of the availability of the written plan and the plan summary. Included within these documents are the requirements necessary for a sale to be commissionable; the plan provides that the sale must generate fees or actual revenue for Defendant in order for a commission to be paid. Plaintiff can point to no person within the employ of Defendant that failed to advise him that the sale was not commissionable before the account was established. More significantly, Plaintiff was not in an inferior position with respect

to the requirements. The plan was available for his viewing and he himself possessed the plan summary which detailed the requirements.

**Negligent Omission Claim**

Plaintiff's reliance on *Lamke v. Lynn*, 680 S.W.2d 285 (Mo.App. 1984)(enforcement of statutory artisans lien under R.S. Mo § 430.020) and *Matheus v. Lutheran Charities Ass'n*, 781 S.W.2d 787, 790 (Mo. 1989)(medical malpractice) is untenable. Neither case allows for a cause of action for negligent omission, and thus as in *Lowdermilk v. Vescovo Building and Realty Co.*, 91 S.W.3d 617, 630, opinion reinstated after transfer to Missouri Supreme Court, (Mo.App. 2002) "Plaintiff[ has] not cited any authority that establishes a cause of action for negligent omission." Plaintiff's Count IV will be dismissed for failure to state a cause of action.

<u>Conclusion</u>

Based upon the foregoing analysis, Defendant's Motion is well taken. Plaintiff has failed to establish the existence of genuine issues of material fact sufficient to overcome Defendant's Motion.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary

Judgment, [Doc. No. 30], is **GRANTED** as to Counts I through III..

**IT IS FURTHER ORDERED** that **Count IV** is **DISMISSED** for failure to state a cause of action.

**IT IS FURTHER ORDERED** that judgment will be entered in favor of Defendant and against Plaintiff.

A separate judgment in accordance with the Opinion is entered this same date.

Dated this 4th day of August, 2008.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE